Okay, Mr. Crouch. Thank you, Your Honors. I'm here today to represent a lady named Stephanie Warren. She was a long-term employee, 16 years, working for Fannie Mae. And during that time, she had an exemplary record. Her managers knew that. Her immediate manager, Marsha Peters, knew that. The manager over there, Mr. Cox, knew that. And both of them opposed her termination. But she was defamed, and that's what we're here to talk about in this appeal. There was an earlier claim that she was discriminated against that was rejected. But this appeal was about termination and the defamation. So, clearly, she was defamed. There was an investigation done. There was a multi-page memo. It was circulated by people employed by Fannie Mae to do the investigation. It was given to people in the company. It was used as the basis for her termination. She was accused of mismanaging Fannie Mae's property. She was accused of not avoiding a conflict of interest. They used that as the basis for terminating her without any prior warning. It's acknowledged there was no prior warning given to my client on any of these topics. So, clearly, there was a defamation. The only issue really becomes, is there a fact issue on the issue of qualified privilege? Qualified privilege allows the employer, when an accusation is made, to do an investigation. As an affirmative defense, it requires that the employer demonstrate that the investigation was done in good faith and that the statements that were made were within the protection of this good faith statement. Now, to defeat a claim of qualified privilege, you have to do, you have to establish malice. Now, malice in this context, malice and defamation is a very, it's a term of art. And so, malice can be showed several ways. It can be showed, obviously, they said it knowing it was false, but it can also be established by showing that it was reckless. It can be established by purposes of showing that when they made the statements, they made a conscious decision not to include other statements that made the statements that they did make substantially false and misleading. Can we go back to your prima facie case, please, of whether or not you have created a fact issue that there was alleged defamation? You have two sources, is that right? The report or is there something else? Yes, the original defamation was this document prepared by the investigations unit. Right, but the document seems problematic because it's my understanding that she believed she was defamed because there was the perception that she was receiving kickbacks. Yes. But the investigative report explicitly says that she's not found no evidence that she received other benefits from the outside broker. So, if you read the report, you would know she didn't get kickbacks. So, how can that be defamatory towards her if that's the source of the defamation? So I think the question from a defamation standpoint, you can have something that is literally true in the report and yet the report taken as a whole creates a context that creates a false gist. But it's not just literally true, it's exculpatory. That's different than just being true. It's saying she didn't do it. Any kickbacks? It's saying that we didn't find any evidence that she took kickbacks and yet we are firing her because she showed favoritism to this person in a way that shows that she mismanaged our property. And so, the implication, the gist, is that we didn't catch her red-handed but we still think she did it and that's why we're firing her. So, the statement that we found no evidence of it, we didn't find any evidence, is actually inculpatory? The gist of the entire document is inculpatory. I mean, they flat out state. So, they have a report that says they found no evidence and still it's creating the impression that the person did it. Exactly. That's what we are. Exactly. It's creating the impression that she mismanaged Fannie Mae. I mean, they say she mismanaged our property. That's part of the reason why she's fired. It says that she didn't avoid a conflict of interest. Are you saying the employee gossip is also defamatory or is it just the report? Well, I think to try and call it gossip is to try and put a label on it and make it something that is not... The employee talk. The employee talk. Does that count as defamatory or is it only the report? I believe it does count as defamatory. OK. Can you point us to anywhere in the record where someone testified that they even heard a named person make a specific defamatory statement about Ms. Warren? There's nothing specific. That's why I called it gossip. If you can give me a citation to the record where some particular person is saying something about her accepting kickbacks or giving favoritism, where would that be in the record? Right. Ms. Small, her friend, is having conversations with the husband of a worker for Fannie, I guess Freddie Mac, it's the other competitor in the industry, and they're talking about this group of people that are being assumed to have accepted kickbacks. And the reason for that is if they hadn't taken anything of value, there wouldn't have been a conflict of interest, they wouldn't have been fired. And everybody knows in the industry when you get fired for a conflict of interest, it means you were taking kickbacks. So the testimony is in Ms. Small's deposition? Ms. Small, there's reference to it there. What happened in those conversations is heavily contested between the parties to the conversation. But that is the implication. What Ms. Warren found when she went to go work for other people in the industry was that people were talking about the allegation of accepting kickbacks. She couldn't even get an interview with Freddie Mac. She'd worked there prior years previously. She knew people there. What people are talking is not specific enough for a prima facie case. That's why I'm trying to get something specific in the record to see if you've made your prima facie case. So it certainly shows damage to reputation. It may not qualify as a publication, an authorized publication. There has to be a publication. So if we don't accept that the report itself is a publication, I'm looking for something else. I'm trying to give you a chance to tell us where in the record there's a publication. So we don't have direct evidence of what happened in sort of behind the scenes in Fannie Mae machinery. What we do know is this started with the report. And we do know that what started with the report was widely disseminated in the industry. We don't have... One last question about the record. Is Chris, is it Coke's or however you say it, is the deposition actually in the record because all the citations to it are somebody is Marsh of Peter's deposition. Every time he's supposed to be the speaker, it's Marsh of Peter's deposition. Is there a deposition from him in this record? I believe I included it. I can't give you exact... Okay, so it's just cited wrong, but it's in there somewhere. My understanding is... I can find it somewhere. That I... Okay, I have not yet found it. I included it as part of the original appendix to the motion for summary judgment. If I didn't, I apologize, but that is my understanding. So turning to the issue of the qualified privilege, we have repeated statements about things that Marsh of Peter's knew, things that Marsh of Peter's told the investigation, things that did not wind up in the final report that was used as a justification to fire him as warrant. And you're saying that goes to malice? That goes to malice, right. If the investigator knows of additional facts and does not include the additional facts in the report, and the result of the report is to create a false impression, then that is evidence of malice. So the most damaging of these, obviously the investigator talked to Marsh of Peter's. We have the investigator's notes, which is thankful. Under current law, it's hard to even bring a defamation if you don't have these insider notes, which you can't get under Texas procedure. But we have the investigator's notes, and we know Marsh of Peter's was telling her things like, I don't see a problem with either Jonathan Spinetto or Mr. Finch going and helping these other brokers. We encourage people like Mr. Finch to help other brokers. Even if they had some sort of an agreement between themselves where this new broker was And then probably the most damaging one, and it's a little bit difficult to interpret, and I have, I will confess I've interpreted it different ways because I can't quite make out what it says, but there's this statement that is used in the termination memo that implies that Ms. Warren was deliberately keeping knowledge of what Mr. Finch was doing from Ms. Peter's, her boss. And yet in the actual notes, there's something that can be interpreted as someone told Ms. Peter's that Mr. Finch was flying under the radar, or even SW, Stephanie Warren, told her Mr. Finch was trying to fly under the radar. Now, we are entitled, I think, to argue any interpretation that would be most advantageous to Ms. Warren that is plausible is the one that the Court should use for summary judgment purposes. If there is an admission in the notes of the investigator that Ms. Warren actually told her boss that Mr. Finch was doing these things, which nobody understood to be wrong at the time, then we have a clear and intentional falsehood in the termination memo. So I think this is a situation where the Court has overreached, that we have a fact issue on the issue of qualified immunity. We've got a woman who her supervisors say was an honest woman, a hard worker, had never been counseled on any of these alleged policies, had never been written up as far as we know. Both of the supervisors, two immediate supervisors, said they would have imposed, opposed her being terminated, but neither one was even asked. And so it's just an incredible injustice, creating the false impression that she was mismanaging assets, that's right on the very front of this termination memo, and yet there's no evidence of that. There's no evidence that as a result of any of her actions that these properties were in any way damaged or mismanaged. If anything, it's the opposite. The reason she went to Mr. Finch was Mr. Finch had an excellent reputation of really understanding all of Fannie Mae rules, of making sure that they were all followed, and that Ms. DiGia, if I've got her name correctly, went to Mr. Finch precisely because he was such an expert. There's no evidence that any favoritism at all was shown, Ms. DiGia, in terms of her being selected. Apparently the process whereby you find and add a new REO broker is the first place you go look is Fannie Mae has a list. There was one person on the list, and Ms. DiGia was already on the list. So that's where she was going to start making that decision who's the new broker to add. The fact that she got the same answer by calling up Mr. Finch and asking for a recommendation by a nationally known broker is just icing on the cake for doing what she would have done already in terms of approaching this woman and asking her to become an REO broker for Fannie Mae. There's no evidence that she did a poor job. In fact, the evidence is exactly the opposite, that she did an excellent job managing the business. There's no evidence my client was ever trained that if there was some business relationship between the two that it was somehow improper. In fact, the evidence is that there was no training on the subject, and only after there was training did this even become an issue. And during the time frame when guidance was given, we've established in the record that Ms. Peters was made aware that Mr. Finch was assisting on the property. So we believe we have clear evidence that a jury should answer the question of whether or not the qualified privilege applies here and what we think is improper for the trial court to have taken that decision away from the jury. Thank you. Do you believe that this Jefferson document matters in any way? Absolutely, yes. That you have to have this or else you lose? No, it's not dispositive, but it is helpful. So remember, this is an affirmative defense that Fannie Mae must establish. So first of all, you can always establish reputation for truthfulness. We've properly proved it up as testimony on reputation for truthfulness. Secondly, when good faith is a requirement, as it is of the qualified immunity, you have to show good faith in their investigation. Then testimony that a person in the same department with a similar job title using the same investigators received what she thought was an intentionally false report from Ms. Chadsey, she says, Ms., I gave her evidence that showed her statements in that report were false, and she doesn't even mention most of them. So we have specific acts under the rule, I think it's 405B, where good faith is an affirmative element of the affirmative defense of qualified privilege, we are entitled to use reputation evidence. We are entitled to use specific acts to show that this investigator was not using good faith, that she was, in fact, in Ms. Jefferson's case, she had already written the opinion claiming that Ms. Jefferson's complaints had no merit, and she didn't even call Ms. Jefferson until after she'd already written her paper. So we think it is relevant, and the trial court erred in excluding her. Thank you. You've saved time for rebuttal, Mr. Crouch. Thank you. Ms. McGuinn. Good morning, Your Honors. My name is Madonna McGuinn. I represent Fannie Mae. Fannie Mae has fully briefed every issue raised by Ms. Warren in her appeal. In some, she raises conclusory statements, speculation, unsubstantiated assertions, and hearsay. Warren has never been able to articulate with specific evidence, including time and place, precisely how any defamatory statement is imputed to Fannie Mae. Today, I will focus primarily on Ms. Warren's failure to meet her burden to overcome Fannie Mae's defense of qualified privilege. Because Fannie Mae raised qualified privilege, this court need not make findings as to the truth of any communication by Fannie Mae relating to the complaint, the investigation, or Ms. Warren's termination. As this court noted in Duffy and Jackson, references and accusations made by an employer about an employee to one with a common interest or duty clearly come within the doctrine. This defense of qualified privilege can only be overcome by Ms. Warren, by her showing overpublication or actual malice, and Ms. Warren has evidence of neither of those. Why can't malice be implied by failure to include certain helpful information to her in the report, just for purposes of creating a fact issue? Well, actual malice isn't an incompetent investigation, or it's not a second-guessing they can't second-guess what went into the report. Actual malice is not negligence. It's not even evidence of animosity. Ms. Warren must show, under Conte Commodities and Duffy, that Fannie Mae made a statement with knowledge that it was false and with reckless disregard of the truth. Reckless disregard is a high degree of awareness of probable falsity, and that could be shown by presenting evidence to permit the conclusion that the defendant, in fact, entertained serious doubts as to the truth of his publication. There is no showing by Ms. Warren that Fannie Mae entertained any doubts, never mind serious doubts, as to the truth of the report. Fannie Mae received an allegation, it investigated, it analyzed the information gathered, and it came to conclusions. Based on its conclusions, the company directed termination. The report is in the record at 1991 to 2000. What's important here, and what goes to your point, Your Honor, is that Warren points to no evidence that the investigators doubted the truth of the evidence they assembled and the conclusions they reached. With respect to the notes that Mr. Crouch talked about, the notes are in the record. There is nothing about the notes that at the time of the investigation would have indicated that the someone that Ms. Peters was talking about was Stephanie Warren. In fact, Ms. Peters, her manager, said she didn't remember, but if she did say that, it was probably somebody else that she was talking to about Mr. Finch, and all it says is that someone told her that he was under the radar. It doesn't say anything about whether Ms. Warren was working with him to conceal it from her manager, and that's very important. They talk about what Ms. Peters would have done, but what in fact was part of the findings of the report was that Ms. Warren hid information from her manager and did not tell her manager. There's no real allegations of overpublication, as Your Honor pointed out. Before we get to that, okay, you agree that omission of facts from a report under certain circumstances can overcome the privilege, right? It can in some circumstances, Your Honor, yes. And it depends on whether there's, that the publisher suspects that the omission would create a false and defamatory impression or not. That would be, yes, Your Honor. If you exclude information, the exclusion itself would have to create this slant or false impression. And the case that Mr. Crouch has cited in his brief is Turner. It comes from the Supreme Court. That's a pretty outrageous case. It's a reporter who reported on a lawyer and indicating that the lawyer had something to do with the fraud of his client. But in that case, the lawyer did not win because at the time of the news articles, he could show no evidence that the reporter believed that what he was saying wasn't true, that it was a calculated falsehood. And there's nothing that Ms. Warren has pointed to that shows that anything in the report was a calculated falsehood, was excluded for purposes of making it slanted, and certainly nothing at the time of the investigation that the investigator or the report would indicate that it was intended to be false. Did it make it look like she was concealing from her boss? Her own evidence, her own statements made it look like she was concealing from her boss. Instead of being as part of the investigative effort to be supportive of the investigation, but to make it then became like this is on her own because she thinks she did something wrong. The inference is very different. Your Honor, I'm not sure I understand the question. I'm sorry. The issue, are we talking about the notes that were excluded? So the notes simply say that someone might have told the manager that this outside broker, Finch, was flying under the radar. That's it. It says nothing about Ms. Warren. Well, except that she says that it's abbreviation from her name. It says someone. I thought it says SW with some squiggles maybe or something. They argue that. I don't know. The document is in the record. It doesn't say SW, and the district court judge found fault with the fact that it was repeated again. This was looked at in detail by the district court, and it was raised in the appeal of the discrimination case when it first came before the Fifth Circuit. And not only did the lower court judge exclude Paragraph 22, where Ms. Warren talks about how she might have been the one who said something to the manager, it found that the notes themselves said someone. And when it came up to this court, the court affirmed the summary judgment on the discrimination case. They are trying to recycle those same notes and the same argument to say that that indicates some sort of malice on the part of Ms. Chadzi. And that's where we raise the law of the case. The underlying court in this court affirming the basic background facts that were presented about Ms. Chadzi in the report did not amount to pretext in the discrimination case. And pretext, not finding pretext, it's a heavier burden for Ms. Warren to recycle and have this court relook at all those facts to find the heavier burden of actual malice. Do you want to talk about publication, excessive publication? The publication, the overpublication is what Ms. Warren has to prove, one of the things that she has to prove to overcome the qualified privilege. Fannie Mae received an allegation, it investigated, it analyzed the information, it came to conclusions, and it distributed the report to people with a business need to know, an interest. It sent it to HR people, to respondents management chain, and other relevant business units. Warren points to no evidence that anyone who Fannie Mae informed about the findings of its internal investigation communicated the information to persons not reasonably interested in the subject matter. And she has shown nothing that would evidence republication or that republication of the report was reasonably foreseeable by Fannie Mae. This is what that unit does. When it gets allegations, it looks into them. The head of that unit, Leslie Arrington, in her deposition, said that in addition to it having confidential on each page, inappropriate disclosure of such confidential reports would itself constitute a violation of the company's confidential information policy. And that deposition is in the record at 2121 and 2185. The unauthorized gossip that Your Honor asked Mr. Crouch about, that is talked about and while there's some people identified, others are unidentified coworkers, that conduct does not take Fannie Mae outside the scope of its qualified privilege. With respect to all the individual statements she alleges, Ms. Warren has failed to show that the statements, if made at all, were made in the course and scope of the person's employment with Fannie Mae. To take someone out, to have a statement take the qualified privilege away from Fannie Mae, it would have had to been made to somebody who had an interest in and had the report itself. These are only random people, not identified, without specific time or place, who are saying exactly the opposite of what was in the report. So if they, in fact, had the report, they would know it said that she didn't take kickbacks or gifts of any kind. The second issue is the exclusion of the Jefferson Declaration. This same declaration, another person who was terminated in these kind of cases, very similar set of facts, different manager, different outside broker, Lynette Sandage. That case came up to the judge in the U.S. District Court and then came to this court. They tried to use that same declaration to do the same thing in that case. That was excluded by the trial judge, and it was excluded in affirming summary judgment. The declaration contains conclusory statements by Ms. Jefferson. While she worked at Fannie Mae at the same time, she had a different job, she raised complaints that were not complaints made against her. There's nothing specific about what she says other than conclusory remarks, and she also includes in it hearsay and double hearsay. She talks about a woman, Ms. Bynum-Wilson, who heard something about Ms. Warren, and what she says is, Ms. Jefferson says, Bynum-Wilson got it from other Fannie Mae employees. She never even attempts to say that the information was in the scope and cost of those employees' jobs with Fannie Mae. Was she opposed? Ms. Jefferson? No, Ms. Bynum-Wilson. No, I don't believe so. Because, you know, in the summary judgment evidence now, you can put in things that could be proven up. Even if it's not technically appropriate anymore, they now allow you to put in summary judgment evidence that could if it needs some level. Where it used to have to all be perfect, it no longer does. But it's Ms. Warren's burden to do that. I'm just, I asked if she had been deposed or anything. No. Okay. Anything else, Ms. McGowan? Unless there are other questions, we ask that this Court affirm the finding of summary judgment and find no manifest error in the exclusion of the Jefferson Act declaration, thereby affirming the trial court's exclusion of it. All right. Thank you, Ms. McGowan. Mr. Crouch, you've saved time for rebuttal. Thank you, Your Honor. So with regard to this page from the notes, I think this is our best evidence showing malice, in the sense that the investigator knew something that could be absolutely critical and yet didn't put it in the report. So one of the interesting things, the investigator is clearly talking about Mr. Finch. RF is how he abbreviates Mr. Finch. She uses the RF notation here on this fourth bullet point down. She uses the RF notation again in the bullet point following it. There's also apparently a reference to Stephanie Warren in the bottom bullet point that appears to show she refers to Stephanie Warren with an SW notation. The page immediately preceding this in the record, there's another apparent reference to Stephanie Warren using the abbreviations SW. If this passage is translated, maybe SW once told her RF said that. And what was said is RF, Mr. Finch, was trying to fly under the radar. That would actually make quite a lot of sense. And the reason I say that is the trying to fly under the radar, that's language taken right out of the email that they use as a basis for termination. Earlier in that same email, Mr. Finch said, why don't we go ahead and tell Ms. Peters about that just so she's not blindsided. Ms. Peters didn't think anybody else mentioned this try to fly under the radar other than the possibility of my client. She said she didn't get it from Mr. Finch. There were three people or two people on that email. There was Mr. Finch and my client. And if she heard it from someone and she didn't hear it from Mr. Finch, there's a strong possibility she heard it from my client. And that means my client told her Mr. Finch is involved with these properties. And that is a critical fact that would undermine the entire implication of the memo that my client was hiding information. In any event, Ms. Peters acknowledges within a month after when all of a sudden Fannie Mae came down with guidance on this, prior to this there was no guidance. There were no rules against splitting fees. There were no rules against talking with brokers. Fannie Mae had actually put together a video of Mr. Spinetto showing a property in Maryland where he was not licensed. So what was she to think? That there's something improper? Mr. David Box, the vice president, actually Mr. Spinetto cleared this idea of can we set up an organization that provides back office support to these rural brokers? Mr. David Box, the vice president, actually approved that plan before Mr. Spinetto went and did all this. So there was no reason for anyone like poor Stephanie Warren to think that anything was going wrong. But nevertheless, this document indicates she talked to her manager about it. And maybe they didn't remember because it wasn't a big deal until all of a sudden in August they got some direction on it. And within a month of getting direction on it, Ms. Peters acknowledges that she knew that Mr. Finch was involved with the management of those properties. So I submit to you that this is a fact issue. This is something the jury should be allowed to decide whether or not Fannie Mae has met its burden in establishing the qualified privilege, whether or not as a fact issue Ms. Warren has set forth evidence to show that there were substantial omissions from this report that set in motion all the subsequent defamations. Even if Ms. Jefferson's testimony is not specific enough to establish a publication, it clearly is relevant evidence in the context of a defamation case because it shows that these statements which originated with a substantially false internal investigations report, the damage to my client's reputation was all across the community. People were talking about it. You know real estate agents. They talk. They network. That's just what they do. It was everywhere, and she couldn't get a job. Sixteen years she worked there, exemplary record. She worked at Freddie Mac before that, exemplary record. Five years she had people over there that she knew. She couldn't even get a return phone call. So I entrust this to you. I hope that you will give my client her day in court.  Roberts.